May it please the court, my name is Stephen Potts and I represent the appellant, Florence White Eagle. I would submit that the lesson to be learned in this case is that if your boss tells you not to borrow money from a bank or in this case the tribal credit program, then perhaps you should not obtain the loan. But given that, how, number one, is that a crime? And how, number two, is that the crime of embezzlement or misapplication or conversion? I don't think there's any question that if your employer tells you to do something or not to do something and if you disregard that, you may well be subject to some sort of employment discipline. But again, how does that become a crime? This is a case where my client had borrowed money a number of times over the years from the tribal credit program run by the Fort Peck tribes. And at the time this case comes up, she still had a on loans to the tribe. She borrowed, she wanted to borrow some additional money, primarily to purchase some furniture, but it also consolidated the prior balance into this loan. And by the time she made, she obtained this loan, she was the BIA supervisor. She had not been the supervisor previously. And so the government has said, well, there are different rules that she violated under the tribal credit program's governing documents. But again, how does that become a crime? Are you speaking now to the embezzlement? Yes. Embezzlement, I think, requires that you lawfully come into possession of money first of all, and then you do something with the money for yourself. And she didn't have possession of the money. She just, she made a loan application. The application was eventually granted, and she obtained the loan. She then made her payments according to the terms of the loan. And a couple years later, she borrowed another $5,000 or so. And again, there's no contention that that loan was improper. And then by the time she was indicted, she was paying that balance down. I think that she, by and large, had the loan that we're talking about in this case, she pretty much had that paid by the time she was indicted, certainly by the time of trial. But she made her payments. And so how is that embezzlement? How is that misapplication? And how is it conversion? I think that all three of them require that the money had to have lawfully come into her possession. I might add a word or two about the bribery charge. That was count three. The government's position is that bribery, that this loan was in essence a bribe because, coincidentally, right around the time she applied for it, she wrote a letter to the mother of one of the people who signed off on the loan. And the mother had had questions. Someone had ‑‑ she'd had information that she had some loans with this tribal credit program, and she thought that she didn't have those loans. And I think the truth is, she didn't have them. Well, you say coincidentally. Could a rational jury have found that there was a quid pro quo there, given the timing of the loan approval and this letter that she sent to Ms. Menz? Well, the only thing that ‑‑ the only thing that was there is the fact that the letter was written and the fact that the loan was applied for. That's all the evidence there was. The other person who's alleged to ‑‑ Toni Grable is the other person that we're talking about. She was dead. She couldn't testify. My client didn't testify. All there is, is the fact that the letter was written and the loan application was made. And the indictment, I might add, charges that the agreement regarding this bribery was made a number of weeks later, in January of 2008. So just following what's been ‑‑ what she was indicted for is no possible way that could be bribery. I don't think you can bribe someone for something they've done in the past, even if that's your position. Well, you know, it seemed to me that this was the potential cover-up with the letter to Menz and then the timing and the sequencing, as Judge Wynn suggests, of when she gets the loan. Now, maybe it didn't matter. Maybe Graybill wasn't instrumental. But the timing and the inferences the jury can draw would seem to me to be there on the bribery charge. Well, if they do, then, the fact of the matter is that what the indictment says is that she's ‑‑ is that there was an agreement made, I think, January 2 of 2008. And if my client had done something improper with respect to this letter, that had already been done. Were you challenging the indictment or the sufficiency of the evidence? Both, but primarily the indictment. But you can't ‑‑ but did you make a claim for a challenge to the indictment? I think so, yeah. We've ‑‑ I mean, we've raised ‑‑ we've raised ‑‑ I know you've raised a lot of claims, but is there, in your view, there's a specific claim for a challenge to the sufficiency of the indictment? Say that again? Is there a specific claim for a challenge to the sufficiency of the indictment as opposed to the evidence? In our appeal brief? Yes.  Okay. Yes, there is. If ‑‑ let me just ask you hypothetically. If the bribery charge were found to be sufficient but several of the other charges, one or two, were found not to be supported by sufficient evidence, what would be the practical impact to your client? Well, it would be difficult for her because the under ‑‑ when the judge followed the sentencing guidelines, the sentencing provisions are harsher because of the bribery charge. So there would be, as far as the sentence itself goes, there would be little practical effect. If it were sent back for resentencing and if we were to accept your argument on the loss calculation and that being an error in terms of the way that the sentencing was configured, what would be the impact there? And would you just state again what you think the district court did wrong in setting out the path to sentencing? Yes. Well, I think I've gone over my time, but we'll just use this. Well, that's fine. Okay. The effect ‑‑ I think under the calculations it would make about 10 months' difference, 10 to 11 months. And the error is that he premised all of the calculations based on the fact that she obtained a $15,000 loan. She really didn't. She already owed 3,500 of the 1,500. So the new money involved was 11,500. In addition, the ‑‑ under the guidelines, she had made payments back before ‑‑ before she was investigated, before anything was said about this, and that has to be taken into account also. He really didn't do that because she later borrowed another $5,000. And, again, there's no contention that that loan was wrong, but he added that in and said, well, she owed 12,900 and something as of the date that he found that was relevant. And she did owe it, but under this other loan there's no contention that she did anything wrong. That shouldn't be part of the calculation. We should have been talking about approximately 7,900 and some dollars. Overall, our position is when you borrow the money in the first place, there really isn't ‑‑ it's not like she took this money, but that's another argument also. So it may be that there's no harm and no benefit at all. That's an additional argument. Thank you. We'll give you some time for rebuttal. Thank you. Good morning. May it please the Court. My name is Carl Rosted. I'm an assistant U.S. attorney out of Great Falls. I was the trial attorney for this case and the other ten related cases that came out of the Fort Peck credit program investigation. I want to address, first of all, Mr. Potts's contention that there was nothing wrong with the subsequent $5,000 loan. Merely because it wasn't charged doesn't mean that there was nothing wrong with it. If we review the testimony of Mr. Staffney, who was the person that succeeded Ms. Grable after her death, his testimony clearly indicates that he was pressured into signing off on that loan. And, again, you have the problem of a superintendent of the BIA, the highest ranking Federal official, having a subordinate sign off on her own loan, which was improper, I mean, from the very get‑go. There are other problems with the loans that are also glossed over that have nothing to do with the ethical violation. First of all, this $15,000 loan was beyond the $2,000 limit for short‑term loans. Short‑term loans are deducted from the payroll. Long‑term loans have the additional collateral of the trust properties of individual Indian members to secure these larger loans, and they are longer term. What basically occurred here was Ms. Grable was able to give $15,000 to Ms. White Eagle in basically for only a payroll deduction. And as you can see, to add to the corruptness of this loan, from the application that Ms. White Eagle filled out in December of 2007 to the time that she was actually approved, those terms changed, and her trust commitment in the application is now gone. And it results in approximately $10,500 that the tribe was supposed to get in repayment of this loan that it never did not receive under the terms of the loan. So there was a lot of problems with this loan over and above the fact that the Bureau of Indian Affairs had told her not to take it. Mr. Potts is correct when he says that the earlier loan, when Ms. White Eagle was in the Realty Department and not a supervisor over credit, there was nothing wrong with those loans. She was able to take them because there was no ethical problem, and we presume that she went through the normal steps and did not have a corrupt loan. But once she became superintendent, there are all sorts of problems with this $15,000 loan, again, beyond the problem with the fact that it was a violation of her Federal ethical obligation. Let's talk about that. So the supervisor says, don't take any loans. Do you think that is sufficient to be the basis for an ethical violation that would mature into a criminal violation? In this particular instance, Your Honor, under the 208 count, the public action in terms of a personal financial reward, we believe that taking of the loan did constitute what we didn't charge it that way. We charged it with regard to the action taken to hide the Christiansen loan. I don't know that it would constitute, merely taking the loan would constitute an ethical violation, and it wasn't charged that way. You're talking about count 5 now? Yes, ma'am. And the particular matter that the government is relying on with regard to count 5, is it the effort to convince Ms. Grable's husband to pay the loan or the failure to report, or could it also be the letter that was sent to Ms. Menz? Well, the Menz loan isn't part of it, Judge Winn. The Menz, this is only the Christiansen loan that's discussed in that particular count. And what the particular matter is, her facilitation of getting Arthur Grable, and it gets a little confusing because there's Arthur Grable, the husband, and Arthur Grable, the son. And getting Arthur Grable, the husband, to come in and pay off the loan, we consider that to be her official act. Ms. Christiansen didn't just go to anybody. She went to Florence White Eagle. Now, the reason you go to the superintendent of the tribe is for her to use her position and authority to get her basically off the hook for this money that she had helped her sister take out of the program years before. See, I hear that, and I see something is wrong with that, what she's doing, right? But then I look at what the charge is under count 5, and I'm trying to figure out how it would directly and predictably affect her personal financial interests. And it seems that's where I'm having some trouble bridging the gap, at least on that count. Maybe you can help me out. And I'm glad you asked that, Judge McKeown, because it is our theory of the case that this, if you read the record, the corruption in this particular credit program had gone on for like 20 years. I mean, by the time that the investigators got there in the summer of 2009, they'd find $1.2 million in fraudulent loans had been going on for an extremely long time. It's our theory that the people that were in charge, including Florence White Eagle, Tony Grable, and various other people, wanted to preserve their access to those funds. And just like in 2007, when the members of the credit committee concealed all of their fraud by putting the names of deceased Indian tribal members in for all the loans they'd taken out, what happened again, and you see it with the men's complaint, again trying to suppress. The reason for all that suppression is to keep the BIA from finding out what's been going on to continue the access that they would have. And as we've discussed, Ms. White Eagle took advantage of that access in getting another loan farther down the road. So the particular matter is a fairly precise term as opposed to some broad, well, I hope I can cover up today and benefit tomorrow. At least on this count five, I'm still maybe having some trouble understanding what's the particular matter that ties up with Ms. White Eagle. The particular matter, Judge McKeown, that we've alleged in the indictment was the facilitation of the repayment of the loan, which in turn satisfied Mrs. Christiansen so that she would not continue to raise problems that would bring the BIA in to look at that loan program. So let me just get at this. It's not really the personal interest of Ms. White Eagle. It's that by covering this up, it takes that loan off the books, therefore, the big guys don't look with more scrutiny, and therefore, if they don't look with more scrutiny, then life goes on. Don't surprise them with that pot of money that they're using, too. That seems pretty remote compared to it. You have to admit. It's like painting an abstract painting on that one. Your Honor, I can see the Court's concern, but I guess we didn't look at it that way. We looked at it from the standpoint of if you've got this rather large pot of money that you can access any time for as long as you maintain control over it, that is a pretty significant personal interest in our view. I mean, obviously, Mrs. White Eagle had no compunction about taking money out of the program. She took money out in the January of 2008 when she was told not to, and she took $5,000 more out subsequent to that. I really think that is. When you sit there and say, here's an account that I can basically tap any time, that is a significant personal interest in our view. Whether the Court finds it as a legal matter to be too remote, I'll leave it to your better judgment. But in our view, that was not too remote. Could you go to the embezzlement charge? That statute has a bunch of subparts of things you might do to violate it. In your view, which of these – which part of the statute should we be looking at, and what did she do to violate that? We considered it primarily a conversion, Your Honor. And this is how we – by analogy, this is how it would be. If you said to somebody, go rob a bank and bring the money back to me and give me the $10,000 you got from that bank robbery, and I'll do something for you, that is the sequence of events we saw here. In other words, Ms. Grable goes and arranges for the loan, and again, under the beneficial terms that we've discussed in our brief. And it was testified to on the stand as how that loan changed and became more beneficial to Mrs. White Eagle. But so it was Tony Grable, who in her position at that time still controlled, supervised Shelley Pipe, who was the top Federal official in the credit program. So there was a direct line of authority from White Eagle to Grable to the loan program. So she tells, you know, in our theory of the case, Ms. Grable to go get her this loan, and so Ms. Grable actually is the person that embezzled. But as the Court is aware, anybody that induces or solicits a crime to be committed is as guilty as the principal, and that's our theory of the case. So I'm reading the definition of conversion that we've had over the years. It says it's the use of property placed in one's custody for a limited purpose in an unauthorized manner or to an unauthorized extent. The property that you're looking at is what? The loan. Which loan? The $15,000 loan. So the you're looking at her conversion based on her loan. Her conversion based on the fact that she told a subordinate to or had a subordinate arrange for her a loan that she couldn't otherwise get. Because she couldn't otherwise get it. Because of the ethical problems. Right. But then you're back to can your supervisor, you know, say, oh, you shouldn't do this, can that be the basis for something being illegal? I certainly think you can, Your Honor, in the public good context. Maybe if this was a plumbing company, that may not be the case. But when you're a Federal employee or a person given financial trust, just like a banker of a bank president who has a fiduciary obligation to his institution, tells somebody to get me a loan that they know they can't take, why is that on embezzlement? And, again, we can't, in focusing on that, escape the fact that this was an entirely bogus loan structured, again, for $15,000, yet only payroll deductions. There was a lot of problems that made the loan fraudulent almost on its own, or not just almost, on its own, because for the amount of money that was taken and the manner in which it was to be repaid, plus the changes in terms between the application and the time the money was taken. Would you address briefly the sentencing issue? Yes, ma'am. The sentencing issue, again, the only reason that that would have any gravitas is if we agreed, as Mr. Potts has tried to assert, that the $5,000 re-up, basically, has nothing to do with the original loan. And we believe that it is also a corrupt loan. Again, we're getting back to all the same things that made it improper for her to take a $15,000 loan, to have a subordinate sign off on a $5,000 loan. So it's kind of, it was her decision to basically put herself in another two-level category by taking out more money, in our view, because the loan, until the scheme was discovered, there was no end to it. It was a continuing offense. And the loss to the tribe is what the loss to the tribe was, or would have been. And the intended loss was the amount of money that she took improperly from the loan funds. If there are no other questions, Your Honors, thank you for your time. Thank you. If you would put a minute on the clock, please, for rebuttal. Thank you. The — I think some of the questions demonstrate the problem with the government's theory on conversion. It's — conversion, first of all, requires that the person who owns the money has to, you know, either not be in agreement or not understand that this is happening. And we have a three-person loan committee that approved the loan. They wanted to make the loan. Mr. Rostad mentioned something about Tony Grabo arranging for this loan, but that's not what happened. The — and you can see — I mean, there's a loan application. It's filled out by my client. It's signed by my client. She applied for the loan herself. Nobody else arranged for the loan for her. I see I'm down to five seconds, so I — thank you. Thank you. The case of United States v. Florence White Eagle is submitted. Thank you both for coming from Montana. Thank you for your argument.
judges: Ripple, McKeown, Nguyen